# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **Case No. 6:09-cr-103-ORL-28-DAB**

**PRINCE TOBURAS JERMAINE ROLLE,**

_____/

## MR. ROLLE'S SENTENCING MEMORANDUM

Defendant, Mr. Prince Rolle, hereby files this Sentencing Memorandum, in which he asks this Court to exercise its discretion under *United States v. Booker*, 125 S. Ct. 738 (2005) and *Gall v. United States*, 128 S. Ct. 586 (2007), and impose a reasonable sentence of no more than 30 months in prison. Mr. Rolle's request is based upon the following: (1) application of the Fair Sentencing Act to Mr. Rolle; (2) Mr. Rolle's personal characteristics; (3) the over representation of Mr. Rolle's criminal history; and (4) the need to avoid disparate sentences. In support of this request, Mr. Rolle states the following:

## I.    FACTS

Mr. Rolle was charged with and pled guilty to possession with intent to distribute and conspiracy to possess with intent to distribute 19.7 grams of crack cocaine. The offense occurred in October 2007. According to the Government, Mr. Rolle's mother was involved with the offense. Mr. Rolle was arrested under the federal warrant on February 12, 2008, has remained incarcerated since that date, and is currently serving a state sentence.

Mr. Rolle was previously diagnosed with emotional issues and did very poorly in school. He never read higher than a 4th or 5th grade level. Furthermore, Mr. Rolle did not know his father

and he helped provide for his mother and sisters at a young age by selling drugs. Mr. Rolle had no

positive role models during his formative years.

## II.    APPLICABLE LAW

Mr. Rolle was charged with and pled guilty to violating 21 U.S.C. § 841 and § 846. At the

time Mr. Rolle committed the offense, it carried a minimum sentence of five years and a maximum

sentence of forty years in prison. As detailed below, because of the Fair Sentencing Act (FSA) the

Court is not constrained by the statutory minimum mandatory. Thus, pursuant to *Booker*, this Court

can impose a sentence of its choosing, after carefully considering all of the § 3553(a) factors,

including "the need to avoid unwarranted sentencing disparities among defendants with similar

records who have been found guilty of similar conduct," "the characteristics of the defendant," "the

nature and circumstances of the offense," "to afford adequate deterrence to criminal conduct," and

"the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for

the law, and to provide just punishment for the offense." 18 USC §3553(a)(1), (a)(2)(A) and (B), and

(a)(6). This would include a non-prison sentence or a sentence below the advisory guidelines.

## III.    APPLICABILITY OF THE FAIR SENTENCING ACT

The plain terms of the FSA, indicate that Congress intended its ameliorative changes to apply

to defendants who had not yet been sentenced as of August 3, 2010, the date the Act took effect. In

addition, applying the FSA in this case avoids serious conflict with the equal protection component

of the Due Process Clause of the Fifth Amendment and the Eighth Amendment's prohibition against

cruel and unusual punishment.

### A.    Background

On August 3, 2010, President Obama signed the FSA, passed by Congress to "restore

fairness to Federal cocaine sentencing." *See* Pub. L. No. 111-220, 124 Stat. 2372 (Preamble). The

Act amends the Anti-Drug Abuse Act of 1986 ["1986 law"] by increasing the quantity thresholds that trigger the statutory mandatory minimum penalties for offenses involving cocaine base ("crack") under 21 U.S.C. §§ 841(b) and 960(b). The quantity triggering the five-year mandatory minimum was increased from 5 grams to 28 grams, and the quantity triggering the 10-year mandatory minimum was increased from 50 grams to 280 grams. Pub. L. No. 111-220, § 2.

Prior to the passage of the Fair Sentencing Act, many commentators complained that the drug laws unfairly targeted minorities. *See* Margaret E. Finzen, Systems of Oppression: The Collateral Consequences of Incarceration and their Effects on Black Communities, 12 Geo. J. on Poverty L. and Pol'y 299, 299-304 (Summer, 2005) (discussing the disproportionate number of African-Americans, with respect to their share of the population, who have been arrested, prosecuted and imprisoned); Craig Reinarman and Harry G. Levine, Crack in the Rearview Mirror: Deconstructing Drug War Mythology, Social Justice, Vol. 31, Nos. 1-2 (2004) (discussing how myths "helped create and sustain a drug scare that resulted in an unprecedented wave of imprisonment, disproportionately of poor people of color."); Kenneth B. Nunn, Race, Crime and the Pool of Surplus Criminality: or Why the 'War on Drugs" Was a 'War on Blacks', 6 J. Gender Race and Just. 381, 383-384, 392-400 (Fall, 2002) (discussing the impact of the war on drugs on African American communities and the disparate impact of federal sentencing laws on African Americans). And, when the FSA was proposed, Senior Officials in the Department of Justice, including Attorney General Eric Holder and Assistant Attorney General Lanny Breuer publicly stated that the reform was necessary because the laws were unjust, unfair, and resulted in a racial disparity. *See* April 29, 2009 comments of Assistant Attorney General Lanny Breuer before the United States Senate Commission on the Judiciary, attached hereto as Exhibit "A."

Despite public comments by Senior Members of the Department of Justice, the Assistant U.S.

Attorney in this matter now urges that the FSA not be immediately applied to defendants sentenced after passage of the FSA. In essence, the Government is asking that this Court continue a practice already deemed by Congress, the President, and even senior members of the Department of Justice to be inequitable and unfair. The Government's position is not supported by the FSA, its legislative history, or the policy behind the law.

Indeed, the Act does not include a saving provision indicating that Congress intended the old law to apply to pending cases. Also, in section 8 of the Act, Congress gave the Commission emergency authority, requiring action within no later than ninety days, to "make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law." *Id.* § 8(2). On October 27, 2010, the Commission followed that directive by amending the Drug Quantity Table at USSG § 2D1.1 to reflect the 18- to-1 crack-to-powder ratio as now set forth in 21 U.S.C. §§ 841(b) and 960(b). The Commission expressly stated that these amendments were intended to "account for" the FSA's new mandatory minimum sentences, and further that its approach is intended to "ensure[] that the relationship between the statutory penalties for crack cocaine offenses and the statutory penalties for offenses involving other drugs is consistently and proportionately reflected throughout the Drug Quantity Table." USSC, Notice of a temporary, emergency amendment to sentencing guidelines and commentary, 75 Fed. Reg. 66,188, 66,191 (Oct. 27, 2010).

In a letter dated November 17, 2010, the lead sponsors of the FSA wrote a letter to Attorney General Eric Holder, urging him "to apply its modified mandatory minimums to all defendants who have not yet been sentenced, including those whose conduct predates the legislation's enactment." (*See* Ex. 1). They note the "absurd result," "inconsistent with the purpose of the FSA," should defendants "continue to be sentenced under a law that Congress has determined is unfair for the next

five years, until the statute of limitations runs on conduct prior to the enactment of the Fair Sentencing Act." *Id.* The sponsors also noted that they "wholeheartedly agree" with Judge Hornby's decision in *United States v. Douglas*, __ F. Supp. 2d __, 2010 WL 4260221 (D. Maine Oct. 27, 2010), in which he concluded that Congress intended the ameliorative changes to apply to a defendant not yet sentenced. *Id.* at 2.

Mr. Rolle pled guilty to conspiracy to distribute 19.7 grams of cocaine base after the FSA was introduced on October 15, 2009, but before the FSA was signed by the President into law on August 3, 2001. Mr. Rolle will be sentenced on February 4, 2011. Applying the FSA in this case means that Mr. Rolle faces no mandatory minimum sentence.

**B.      Congress intended the ameliorative changes in the FSA to apply to defendants not yet sentenced.**

Unlike other statutes, in which Congress has expressly stated that it intended for the old law to apply to pending cases, Congress included no such saving provision in the FSA. To the contrary, Congress included language plainly indicating its intent to end immediately the discriminatory injustice wrought by the 100-to-1 ratio under the old law. As a result, the general saving statute (1 U.S.C. § 109) does not preclude application of the FSA to defendants not yet sentenced.

**1.      The Saving Statute**

Mr. Rolle submits that the Savings Clause does not bar application of the FSA to defendants not yet sentenced because failing to apply the FSA immediately would be contrary to the intentions of Congress. At common law, the repeal of a criminal statute, or its re-enactment with increased or decreased penalties, would have abated all prosecutions not yet final. *Bradley v. United States*, 410 U.S. 605, 607-08 (1973). To prevent such abatements that might arise from legislative inadvertence, Congress passed the federal saving statute in 1871, now codified at 1 U.S.C. § 109. *See Hamm v. City of Rock Hill*, 379 U.S. 306, 314-15 (1964).

Section 109 provides in relevant part:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

While the federal saving statute supplies a general rule of statutory construction, the Supreme Court explained that it "cannot justify a disregard of the will of Congress as manifested either expressly or *by necessary implication* in a subsequent enactment." *Great Northern Ry. Co. v. United States*, 208 U.S. 452, 465 (1908) (emphasis added). The Court expressed a similar view in *Hamm*, 379 U.S. at 308, when it recognized a general "principle . . . of imputing to Congress an intention to avoid inflicting punishment at a time when it can no longer further any legislative purpose, and would be unnecessarily vindictive." In its most recent analysis of the general saving clause, the Supreme Court again recognized that a later enactment can "expressly or by necessary implication" supersede the general saving clause by indicating Congress's intent to abate previous prosecutions. *See Marrero v. Warden Lewisburg Penitentiary* 417 U.S. 653, 655-57 (1974).

More recently, Justice Scalia emphasized in his concurring opinion in *Lockhart v. United States*, 546 U.S. 142, 148 (2005), that the Court has consistently "made clear" that an earlier Congress cannot use an "express-statement provision" (such as the one contained in the general saving clause) to "nullify the unambiguous import of a subsequent statute." *Id.* (Scalia, J., concurring) (citing *Great Northern Ry.*, 208 U.S. at 465).

The FSA was passed in response to a crack to cocaine powder disparity thought by many members of Congress to be unjust and unfair and thought by some to cause racial disparities in sentencing. *See* November 17, 2010 correspondence from Sen. Dick Durban and Sen. Patrick Leahy

to Attorney General Eric Holder, attached hereto as Exhibit "B." And, when Congress passed the FSA, it provided emergency authority to the Sentencing Commission and a 90-day deadline for the Commission to prepare amended sentencing guidelines which attempt to eliminate the sentencing disparity. Congress clearly intended that the FSA apply immediately to correct unfairness, unjustness and a racial disparity contained in the federal sentencing laws. Failing to immediately apply the FSA to all of those sentenced after passage of the FSA would further the unfairness and unjustness that Congress meant to remedy.

### 2. The Fair Sentencing Act

The structure and language of the FSA indicate that Congress intended its remedial legislation to apply as soon as possible, and to all pending cases. Congress passed the FSA to "restore fairness" to crack sentencing, addressing longstanding concerns regarding the racially disparate impact of the 100-to-1 ratio contained in the 1986 law, which turned out to be without evidentiary basis. In addition (and unlike the statute at issue in *Marrero*), the FSA does not include a specific saving provision. To the contrary, Congress expressly granted the Sentencing Commission emergency authority to promulgate amendments "as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act," and specifically directed that it "*shall* [] make such conforming amendments to the Federal Sentencing Guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law." *See* Pub. L. No. 111-220, § 8 (Aug. 3, 2010).

The FSA is silent as to whether or not it applies to offenses that were committed prior to the Act and to pleas or adjudications of guilt prior to entry of the Act. An early version of the FSA was introduced to the House on January 7, 2009 (H.R. 265) by Rep. Jackson-Lee of Texas. Section 11

of the early version of the FSA (H.R. 265) specifically provided that the FSA (H.R. 265) would not apply to crimes committed before passage of the Act. Later versions of the FSA (H.R. 1459, H.R. 3245, H.R. 18, and H.R. 2178) eliminated the clause entirely. And, the final version of the FSA signed by the President (S. 1789) is silent as to whether it applies to crimes committed prior to the passage of the FSA. The elimination of the clause, which would have prohibited application of the FSA to crimes committed previously, indicates a legislative intent to allow application of the FSA to defendants not sentenced before passage of the FSA.

In addition, H.R. 265 did not contain a mandatory directive to the Sentencing Commission and was not to be effective for 180 days after the date of its enactment. In contrast, S. 1789 contained **no** saving clause, contained **mandatory** directives to the Sentencing Commission, and was to be effective on the date signed by the President. In addition to the provisions of the FSA, Congress requires (and has required since 1984) that courts at every initial sentencing apply the guidelines that "are in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4)(ii). Pursuant to this provision, and in conjunction with the emergency amendments Congress deemed necessary to "restore fairness" in sentencing crack offenders, Congress now *requires* courts to calculate the advisory guideline range by applying the amended guideline reflecting the new 18-to-1 ratio at every base offense level, even for those whose offense conduct occurred before August 3, 2010. It would make no sense at all for Congress to require courts to apply the amended guideline to all defendants, resulting in advisory guideline ranges for all calibrated to the 18-to-1 ratio, while at the same time categorically preventing many of the least serious offenders from actually benefitting from their advisory guideline range due to the trumping operation of the old mandatory minimums.

Such an interpretation would fundamentally undermine Congress's goal of reducing penalties

for the least serious offenders.[1]  Taken together, Congress's directive to the Commission in the FSA

to "achieve consistency" with applicable law and its directive to courts to apply the guidelines as

amended in every case clearly demonstrate, either expressly or by "necessary implication,"

Congress's intent to "restore fairness" to all defendants not yet sentenced.

### 3.  Court decisions

After engaging in a detailed analysis of these provisions, Judge Hornby of the District of

Maine reached this very conclusion in *United States v. Douglas*, __ F. Supp. 2d __, 2010 WL

4260221 (D. Maine Oct. 27, 2010): "[B]ased upon the context of the Act, its title, its preamble, the

emergency authority afforded to the Commission, and the Sentencing Reform Act of 1984, . . .

Congress did not want federal judges to continue to impose harsher mandatory sentences after

enactment merely because the criminal conduct occurred before enactment." *Id.* at *6. "If Congress's

action here . . . does not satisfy the adverb 'expressly,' interpreting the Fair Sentencing Act to apply

to all new sentences is certainly a 'fair implication' and a 'necessary implication' of what Congress

has done. Indeed, it is difficult to see anything as demonstrating a contrary implication." *Id.* at *5.

In the end, he noted that he "would find it gravely disquieting to apply hereafter a sentencing penalty

that Congress has declared to be unfair." *Id.* at *6 n.57.

A number of other district courts have determined that the FSA is in fact applicable to those

who have pled guilty prior to passage of the FSA, but are sentenced after passage of the FSA.  Those

---

[1]  This point was emphasized by Professor Douglas Berman in letters filed with the District
Court for the Southern District of New York in *United States v. Santana*, No. 09-cr1022:
> it would be quite anomalous and inconsistent with the whole goal of the [Fair
> Sentencing Act] for those defendants subject to the guidelines (i.e., those
> defendants convicted of offenses involving the highest quantities of crack) to be
> the only ones to immediately benefit from Congress's revision of the triggering
> quantities for mandatory minimum sentences for crack offenses.

*See* Exhibits C & D.

cases in Orlando include:

- *United States v. Johnson*, 6:08-cr-270-Orl-31KRS (M.D. Fla. Jan. 4, 2011) (Presnell, J.) (adopting reasoning in *Douglas*).

- *United States v. Green*, 6:08-cr-270-Orl-31KRS (M.D. Fla. Jan. 7, 2011) (Presnell, J.)(adopting reasoning in *Douglas*).

- *United States v. Francis*, 6:08-cr-271-Orl-35DAB (M.D. Fla. 2011) (Scriven, J.)

- *United States v. Vreen*, 6:10-cr-119 (M.D. Fla. Jan. 12, 2011) (Conway, C.J.) (distinguishing distinguished *Gomes*, stating that *Gomes* only applied to persons who were sentenced prior to passage of the FSA).

- *United States v. Dixson*, 8:08-cr-00360-VMC (M.D. Fla. Aug. 24, 2010) (Covington, J.) (applying the FSA to a March 12, 2010 plea of guilty at a August 24, 2010).

Other courts around the country include:

- *United States v. Douglas*, __F. Supp.2d __, 2010 WL 4260221 (D. Maine, Oct. 27, 2010) (applying the FSA at a sentencing after passage of the FSA, when the defendant pled guilty prior to passage of the FSA on January 11, 2010).

- *United States v. English*, 2010 WL 5397288 (S.D. Iowa Dec. 30, 2010) (applying the FSA to a September 24, 2010 plea of guilty to 25.5 grams of crack cocaine and sentencing to 60 months imprisonment).

- *United States v. Whitfield*, 2010 WL 5387701 (N.D. Miss. Dec. 21, 2010) (applying the FSA to a June 24, 2010 plea of guilty to more than 50 grams of crack for the sentencing held on December 16, 2010).

- *United States v. Angelo*, 1:10-cr-10004-RWZ (D. Mass. Oct. 29, 2010) (Zobel, J.), ("Motion for fair sentencing act as to Bryant Angelo (1). Allowed, as I fully concur

with Judge Hornby's thorough and thoughtful opinion).

- *United States v. Douglas*, Cr No. 09-202-P-H, (D. Mass. Oct. 27, 2010) (Urso, J.).

- *United States v. Shelby*, 2:09-cr-00379-CJB (E.D. La.Nov. 10, 2010) (Barbee, J.) (applying the Fair Sentencing Act of 2010, for the reasons fully stated in an opinion by Judge D. Brock Hornby, United States District Court for the District of Maine in *Douglas*).

- *United States v. Roscoe*, 1:10:CR:126-JTN (W.D. Mich. Nov. 15, 2010.)(Neff, J.).

- *United States v. Favors*, No. A-cr-00384-LY-1 (W.D. Texas Nov. 23, 2010) (Yeakel, J.).

- *United States v. Johnson*, Crim. No. 3:10-cr-138 (E.D. Va Dec. 7, 2010) (Payne, J.).

- *United States v. Holloway,* 3:04-cr-0090 (SDWV Dec. 20, 2010)(Chambers, J.) (ruling that the FSA, including the statutory minimum mandatories, apply in any sentencing after Aug. 3 2010).

- *United States v. Gutierrez*, 4:06-cr-40043 (D. Mass. Dec. 17, 2010) (Saylor, J.) (adopting Judge Hornby's reasoning and holding FSA applied).

- *United States v. Cox*, Case No. 10-cr-85-wmc, 2011 U.S. Dist. LEXIS 2730 (W.D. Wis. Jan. 11, 2011) (Conley, C.J.) (ruling the Fair Sentencing Act applicable to pre-enactment conduct being sentenced post-enactment).

- *United States v. Gillam*, __ F. Supp. 2d - 2010 WL 4906283 (W.D. Mich. Dec. 3, 2010) (following Hornsby)

- *United States v. Duncan*, CR-10-0089-WFN (EDWA Jan. 2011).

- *United States v. Elder*, Case No: 1:10-cr-00132-RWS-AJB (N.D. Ga. 2011) (Story, J.)(distinguishing *Gomes*, *Mickens* and *Bradley*, and ruling the Fair Sentencing Act

applies to current / pending crack cases (including those with conduct taking place before the statute was enacted).

- *United States v. Carter*, Case No. 08-cr-299 (NDNY Jan. 2011) (Scullin, J.) (considering the saving clause and the fact that the FSA does not prohibit a retroactive application).

- *United States v. Watts*, Case No. 09-cr-30030 (D. Mass. Jan. 5, 2011)( Ponsor, J.).

- United States v. Ross, 20140 WL 5168794 (S.D. Fla. Dec. 17, 2010)(King, J.) (despite *Gomes*, finding FSA not retroactive, but applied to defendants who had not yet been sentenced and who committed crime before passage of FSA).

- *United States v. Jones*, Case No. 4:10 CR 233(N.D. Ohio Jan. 2011)(Dowd, J.) (adopting J. Hornsby's opinion).

Despite the various courts concluding that the FSA applies to defendants who committed their crimes before the passage of the FSA but are sentenced after the FSA was passed, the Government asserts that binding precedent requires this Court to not apply the FSA to Mr. Rolle. In this regard, the Government claims that the Eleventh Circuit has already decided that the FSA should not apply to offenses committed prior to passage of the FSA, citing the cases of *United States v. Gomes*, 621 F.3d 1343, 1346 (11th Cir. Oct. 1, 2010)(unpubl. op.); *United States v. Mickens*, No. 10-10347, 2011 U.S. App. LEXIS 427 (11th Cir. Jan. 7, 2011)(unpubl. op.); *United States v. Bradley*, No. 10-11639, 2011 U.S. App. LEXIS 1277 (11th Cir. Jan. 20, 2011)(unpubl. op.). In this Circuit, there is no binding precedent holding that the FSA does or does not apply in a future sentencing where the offense conduct occurred prior to August 3, 2010 and where the defendant was sentenced after August 3, 2010.

The Government's argument to the contrary is misplaced. First, the three opinions cited by

the Government are not binding upon this Court because they are unpublished opinions. Second, all three cases are in a drastically different procedural posture as the instant case and the other cases deciding that the FSA does apply. In all three cases, the Eleventh Circuit was asked to apply the FSA to a defendant who asked for application of the FSA after the defendant had already been sentenced–prior to the passage of the FSA. *See* Docket Sheets for the three cases, attached as exhibits E-G. The Eleventh Circuit's ruling in *Gomes*, *Mickens*, and *Bradley* is consistent with all court who have considered the issue before them. Indeed, the courts have universally found that defendants who were sentenced prior to passage of the FSA are not entitled to be re-sentenced through a retroactive application of the FSA. *United States v. Carradine*. 621 F.3d 575 (6th Cir. Sept. 20, 2010); *United States v. Brown*, 2010 WL 3958760 (8th Cir. Oct. 12, 2010); *United States v. Bell*, 2010 WL 4103700 (7th Cir. Oct. 20, 2010); *United States v. Lewis*, 2010 WL 4262020 (10th Cir. Oct. 29. 2010); *United States v. Rivera*, 2010 WL 4679901 (M.D. Fla. Nov. 10, 2010) (Steele, J.); *United States v. Mack*, 2010 WL 4068518 (M.D. Fla. Oct. 18, 2010)(Steele, J.); *see also United States v. Reevey*, No. 10-1812. (3d Cir. Dec. 14, 2010)(unpubl. op.) (same, but leaving open whether FSA applies to defendants not yet sentenced).

This is not the case before this Court. Rather, Mr. Rolle is being sentenced after passage of the FSA and he is asking this Court to apply existing law to his sentencing. *See United States v. Gillam*, No. 1:10-cr-181-2 (W.D. Mich. Dec. 3, 2010) (Neff, J.) (reaching the same result, relying on the analysis in *Douglas*, the letter to Eric Holder from the Act's sponsors endorsing the analysis in *Douglas*; *see* Letter from Douglas A. Berman to Hon. Kenneth M. Karas, *United States v. Santana*, No. 09-cr-1022 (Oct. 21, 2010) (Exh. C); *see also* Letter from Douglas A. Berman to Hon. Kenneth M. Karas, *United States v. Santana*, No. 09-cr-1022 (Nov. 30, 2010) (construing the Fair Sentencing Act in a manner that denies minor crack offenders its benefits "is inconsistent with the language and the context of the statute as a whole," "patently unsound[,] and illogical.")(Exh. D);

*United States v. Angelo*, Crim. No. 09-202-RWZ (D. Mass. Oct. 27, 2010) ("I fully concur with Judge Hornby's thorough and thoughtful opinion.") (Zobel, J.).

### 4. Legislative history

The legislative history of the FSA further supports the conclusion that Congress intended its ameliorative provisions to apply immediately and to all defendants sentenced after its effective date. Congress passed the FSA, with virtually unanimous support, to remedy the racially discriminatory impact of the 100-to-1 crack-to-powder ratio established by the Anti-Drug Abuse Act of 1986, which set forth mandatory minimum terms of imprisonment for certain defendants that Congress deemed serious or major drug traffickers, *see* Pub. L. 99-570, 100 Stat. 3207, but turned out to have no evidentiary basis. To invoke the general saving statute to preserve the draconian, racially discriminatory provisions of the 1986 law would entirely frustrate the will of Congress and "set its legislative mind to naught." *Great Northern Ry.*, 208 U.S. at 465.[2]

Given the longstanding and widespread concerns about the 1986 law, members of Congress expressed an urgent need to remedy its unfairness. Senator Durbin urged that "[e]very day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust." 156 Cong. Rec. S1681 (daily ed. Mar. 17, 2010). Indeed, a "review of the entirety of the record" demonstrates that "Congress intended the amended sentencing provisions of the FSA to apply not only to those defendants who committed a crack offense after the enactment date, but also as soon as possible to cases currently pending, and

---

[2] *See also United States v. Spencer*, No. Cr. 09-400 JW (N.D. Cal. Nov. 30, 2010) (Ware, J.); *United States v. Favors*, No. 1-cr-00384-LY-1 (W.D. Tex. Nov. 23, 2010) (Yeakel, J.); *United States v. Johnson*, No. 3:10-cr-138 (E.D. Va. Dec. 7, 2010) (Payne, J.); *United Sates v. Shelby*, No. 2:09-cr-00379-CJB (E.D. La. Nov. 10, 2010) (Barbier, J.); *United States v. Gutierrez*, 4:06- cr-40043 (D. Mass. Dec. 17, 2010) (Saylor, J.); *United States v. Dixson*, No. 8:08-cr-00360-VMC (M.D. Fla. Aug. 24, 2010) (Covington, J.).

especially to those cases which have not yet involved even an initial sentencing." Letter from Douglas Berman to Hon. Kenneth M. Karas, at 2, *United States v. Santana*, No. 09-cr-1022 (Oct. 21, 2010).

The FSA's legislative history demonstrates that Congress passed the Act after longstanding criticism of the harsher mandatory minimums. The function of a saving statute "is to express the legislative intention to preserve the designated expectancies, rights or obligations from immediate destruction or interference." Millard H. Ruud, *The Savings Clause – Some Problems in Construction and Drafting*, 33 Tex. L. Rev. 285, 286 (1955). That function is not served when a party cannot reasonably expect that the unjust, racially disparate, scientifically unsound provisions of the 1986 law would remain intact following the provisions of the Act. *See Sutherland Statutes and Statutory Construction* § 41:4 ("fulfillment of the parties' reasonable expectations may require the statute's retroactive application").

The Department of Justice certainly has no legitimate interest in enforcing the arbitrary triggering quantities in the 1986 law. Assistant Attorney General Lanny Breuer made plain the Department's view that the 1986 law "is especially problematic because a growing number of citizens view it as fundamentally unfair. The Administration believes Congress's goal should be to completely eliminate the sentencing disparity between crack cocaine and powder cocaine." Statement of Lanny A. Breuer, Ass't Attorney General, Criminal Division, U.S. Dep't of Justice, *Restoring Fairness to Federal Sentencing: Addressing the Crack Powder Disparity*, at 10 (Apr. 29, 2009)(available at http://judiciary.senate.gov/pdf/09-04-29BreuerTestimony.pdf.). And the administration maintained that position during the passage of the Fair Sentencing Act. 156 Cong. Rec. S1683 (daily ed. Mar. 17, 2010) (statement of Sen. Patrick Leahy) ("Attorney General Holder also reminded us that 'the stakes are simply too high to let reform in this area wait any longer.'").

Moreover, as set forth above, the lead sponsors of the FSA have indicated they have no interest in the Department's enforcement of the old Act against defendants not yet sentenced. They emphasize that Congress's goal in passing the Act "was to restore fairness to Federal cocaine sentencing as soon as possible." *Id.*

C.    **The general saving statute does not otherwise preserve the crack quantities triggering mandatory minimums under the 1986 law.**

Assuming arguendo that Congress's intent is not entirely clear, further analysis of the saving statute shows that it does not preserve the 1986 law's unjust restrictions on the court's discretion.

1.    **The FSA did not release or extinguish any "penalty."**

Unlike the statute at issue in *Marrero*, the FSA's modification of the amount of cocaine necessary to trigger the mandatory minimum did not plainly "release or extinguish" a "penalty, forfeiture, or liability" in the 1986 law, as those terms are used in 1 U.S.C. § 109. As a result, the general saving statute does not apply.

The FSA did not repeal any penalty contained in the statute. The Act merely modified the extent to which the amount of drugs involved in the offense cabins the court's sentencing discretion. *Harris v. United States,* 536 U.S. 545, 567 (2002) (sentencing factor that triggers mandatory minimum merely limits the court's discretion in selecting penalty within statutory permissible range). The mandatory minimum terms of imprisonment of the 1986 law and the FSA remain at five and ten years, as do the statutory maximum terms of forty years and life imprisonment. The saving statute, therefore, does not bar application of the FSA to pending cases.

2.    **The FSA discarded a procedure, not a penalty.**

The general saving statute "does not ordinarily preserve discarded remedies or procedures." *Marrero*, 417 U.S. at 661; *Bridges v. United States*, 346 U.S. 209, 227 n.25 (1953). The line between

a right to enforce a liability or penalty, and a remedy or procedure, is contextual. *United States v. Blue Sea Line*, 553 F.2d 445 (5th Cir. 1977).

As an example of a remedy or procedure that would not be preserved by the general saving statute, the Court in *Marrero* cited *United States v. Obermeier*, 186 F.2d 243, 253 (2d Cir. 1950). 417 U.S. at 661. In *Obermeier*, the Second Circuit held that the saving statute did not preserve the period of limitations for a prosecution after Congress had passed legislation reducing the statute of limitations from five to three years. According to *Obermeier,* a statute of limitations defines neither a substantive right nor liability within the meaning of the saving statute. Yet, there is no question that a statute of limitations governs the punishment that may be imposed upon an individual such that a legislature may not extend a statute of limitations for a criminal offense where the prosecution would otherwise be time-barred without violating the ex post facto clause. *Stogner v. California*, 539 U.S. 607, 613 (2003).

Other examples of remedies or procedures not preserved by the general savings statute, but that nevertheless altered the punishment that could be imposed, include an overhaul of juvenile justice procedure, *United States v. Mechem*, 509 F.2d 1193, 1196 (10th Cir. 1975), and changes in maritime law, which replaced criminal penalties with civil penalties. *Blue Sea Line*, 553 F.2d at 449. In both instances, new legislation either ameliorated or extinguished a penalty, but the courts nonetheless held the saving statute did not preserve the old penalties.

The FSA's change in the quantity of crack necessary to trigger a mandatory minimum worked a procedural change. The Supreme Court has said "[a] rule is substantive rather than procedural if it alters the range of conduct or the class of person that the law punishes. In contrast, rules that regulate only *the manner of determining* the defendant's culpability are procedural." *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) (emphasis in original).

In this case, the FSA did not alter the range of conduct or the class of persons that the law punishes. Trafficking in crack cocaine is still a crime and no class of persons is excluded from punishment. *Cf., e.g.*, *Curtis v. United States*, 294 F.3d 841, 843 (7th Cir. 2002) (holding that the rule in *Apprendi*, 530 U.S. 466 (2000), is not retroactive because it addresses the "quantum of evidence required for a sentence, rather than with what primary conduct is unlawful"); *Sepulveda v. United States*, 330 F.3d 55, 62 (1st Cir. 2003). Instead, the Act altered the *method* for determining the permissible punishment by changing the weight that a judge must place on a particular fact (drug quantity), for sentencing purposes. The FSA modifies one aspect of the judicial sentencing factor process, allowing broader discretion in applying 18 U.S.C. § 3553(a).

Cases addressing the retroactivity of *United States v. Booker*, 543 U.S. 220 (2005), in post-conviction proceedings under 28 U.S.C. § 2255 provide further support for the FSA as a procedural change. *Booker* dramatically changed federal sentencing by making the Sentencing Guidelines advisory, rather than mandatory. Yet, courts universally hold that *Booker* wrought a procedural change, not a substantive one, and thus was not applicable to cases that became final before it was decided.

**D.      Applying the FSA in this case avoids serious constitutional questions.**

This Court should construe the general saving statute and the FSA in a way that avoids violating the Fifth Amendment guarantee of equal protection and the Eighth Amendment guarantee against cruel and unusual punishment. When a statute is susceptible to two constructions, one of which raises grave and doubtful constitutional questions, and the other, which avoids such questions, the court's duty is to adopt the latter. *Jones v. United States*, 526 U.S. 227, 239 (1999).

**1.      Fifth Amendment**

The general saving statute must be narrowly construed to avoid conflicting with the equal

protection component of the Due Process Clause of the Fifth Amendment. When the Supreme Court announces new rules of substantive or procedural law, those rules apply to cases not yet final. *Griffith v. Kentucky*, 479 U.S. 314 (1987). In *Griffith*, the Supreme Court held that its earlier decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), applied to cases on direct review when the Court decided *Batson*. While relying in part on its own "norms of constitutional adjudication," the Court also recognized that the "selective application of new rules violates the principle of treating similarly situated defendants the same," 479 U.S. at 323, a principle that arises out of the guarantee of equal protection. *See Lawrence v. Texas*, 539 U.S. 558, 579 (2003) (O'Connor, J., concurring). *Griffith*'s rule applies to cases interpreting congressional statutes. *See Johnson v. United States,* 520 U.S. 461, 467 (1997) (defendant on direct appeal obtained benefit of *United States v. Gaudin*, 515 U.S. 506 (1995), which holds that materiality is an element of perjury that must be submitted to jury).

The same equal protection principle behind the Supreme Court's decision in *Griffith* should apply here. Just as an ameliorative change in the judicial interpretation of a criminal statute must apply to cases on direct review, *e.g.*, *Gaudin*, it must apply here to an ameliorative change to the drug quantities that trigger a mandatory minimum. As discussed earlier, Congress enacted the FSA to correct the racially disparate impact of the 100-to-1 crack cocaine powder ratio. Indeed, members of Congress expressly noted that the old ratio was "contrary to our fundamental principles of equal protection under the law." *See, e.g.*, 156 Cong. Rec. H6196-01 (daily ed. July 28, 2010) (Statement of Rep. Clyburn); *see also supra* Part I.D & note 7. Here, Mr. Rolle has not yet been sentenced, so application of the law currently in effect is even more appropriate.

Congress acted *purposefully* and *positively* to ameliorate the racially disparate impact of the unfounded 100-to-1 ratio in the 1986 law. Under these circumstances, if Congress at the same time intended the 100-to-1 ratio to still apply to those whose conduct occurred before the effective date

of the FSA, then it has purposefully reaffirmed discriminatory legislation, in violation of the Fifth Amendment.

### 2. Eighth Amendment

Applying the FSA to cases not yet final will also avoid a conflict with the Eighth Amendment.[3] The constitutional protection against cruel and unusual punishment requires that a sentence serve at least one of the purposes of sentencing: retribution, deterrence, incapacitation, and rehabilitation. In serving those purposes, the punishment should be "graduated and proportioned" to the offense. *Weems v. United States*, 217 U.S. 349, 367 (1910). The Supreme Court has delineated two separate lines of inquiry under the Eighth Amendment. One focuses on the particular sentence imposed on the defendant and asks whether it is grossly disproportionate. The other uses "categorical rules to define Eighth Amendment standards." *Graham v. Florida*, __ U.S. __, 130 S. Ct. 2011, 2022 (2010). When a defendant challenges a "sentencing practice itself" and "implicates a particular type of sentence as it applies to an entire class of offenders," a categorical analysis applies. *Id.* (holding that imposition of life without parole on a non-homicide juvenile offender is cruel and usual).

Here, the categorical analysis applies because the defendant challenges the application of mandatory minimum sentences to those offenders who possess 5 grams or more but less than 280 grams of crack cocaine. "The analysis begins with objective indicia of national consensus." *Graham*, 130 S. Ct. at 2023. A growing consensus in our society recognizes that the exceedingly harsh sentences for nonviolent crack cocaine offenders set forth in the 1986 law exceed that which is necessary to accomplish the goals of sentencing, and create arbitrary disparities. *Kimbrough v. United States*, 552 U.S. 85, 95-100 (2007) (criticizing crack-powder disparity). The U.S. Sentencing

---

[3] The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

Commission repeatedly recommended that Congress repeal the 100-to-1 crack-powder ratio in favor of a 1-to-1 ratio. *See, e.g.*, USSC, *Cocaine and Federal Sentencing Policy* (2007).

Recognizing the urgency of the problem, the Commission lowered the guidelines for crack offenses, stating that the 100-to-1 ratio "undermines various congressional objectives set forth in the Sentencing Reform Act and elsewhere." USSG App. C., Amend 706. In addition to community consensus, a court conducting an Eighth Amendment categorical analysis "also considers whether the challenged sentencing practice serves legitimate penological goals." *Graham*, 130 S. Ct. at 2023. In doing so, it looks to the "culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Id*. at 2026. Here, offenders who committed their offenses before August 3, 2010 are not more culpable than those who committed their offenses after August 3, 2010. Indeed, the legislative history of the FSA and events leading up to its passage shows that the 1986 law overstated the culpability of this category of crack offenders. *See, e.g.*, USSC, *Cocaine and Federal Sentencing Policy* 8-9 (2007) ("[1986] quantity-based penalties sweep too broadly and apply most often to lower level offenders;" "[1986] quantity based penalties overstate the seriousness of most crack cocaine offenses and fail to provide adequate proportionality.").[4]

Nor can continued application of the harsh and discriminatory 1986 law be justified as a matter of retribution, deterrence, incapacitation, or rehabilitation. *See Graham*, 130 S. Ct. at 2028; *Ewing v. California*, 538 U.S. 11, 25 (2003); *Kennedy v. Louisiana,* 128 S. Ct. 2641, 2649-50

---

[4]     For over a decade, the Commission had urged Congress to reform the 1986 law. *See* USSC, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (1995); USSC, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (1997); USSC, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (2002); *see also Kimbrough v. United States*, 552 U.S. 85 (2007) (citing the Commission's 1995, 1997, and 2002 reports to Congress).

(2008); *Roper v. Simmons*, 543 U.S. 551, 571-72 (2005). "With respect to retribution – the interest in seeing that the offender gets his 'just deserts' – the severity of the appropriate punishment necessarily depends on the culpability of the offenders." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). Congress has determined that the mandatory minimum sentencing provisions of the 1986 law were too severe and did not reflect the relative culpability of drug offenders. Congress' judgment about the culpability of drug offenses provides powerful evidence that society views offenders like the defendant as less deserving of mandatory minimum sentence than other offenders. The public also believes that mandatory minimum sentences are too harsh. *See* Peter H. Rossi & Richard A. Berk, *Public Opinion on Sentencing Federal Crimes* (Mar. 14, 1997). To sentence an individual to a lengthier period of incarceration based upon the mere fortuity of when he or she committed the offense would be mindless vengeance, imposed without regard to individual moral accountability.

Application of the 1986 law also "makes no 'measurable contribution' to the goal of deterrence." *Roper*, 543 U.S at 593. Given that a person who currently commits a cocaine trafficking offense will not be subject to the 1986 law, it is fanciful to think that a now defunct law will deter anyone. As to rehabilitation, mandatory terms of imprisonment do not even purport to advance that purpose, and in reality, they impede it. *See* USSC, *Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 6-7, 13-15 (1991). In short, a sentence based on the mandatory minimum provisions of the 1986 law is "a sentence lacking any legitimate penological justification" and "by its nature disproportionate to the offense." *Graham*, 130 S. Ct. at 2028.

Given these grave concerns about the Fifth and Eighth Amendment implications of applying the 1986 law to defendants whose offense occurred before August 3, 2010 and whose convictions are not yet final, this Court should decline to apply the general saving statute to preserve the drug quantities specified in the 1986 law.

## IV.    Mr. Rolle's Request for a Variance under 18 U.S.C. § 3553

Having established that the FSA applies to Mr. Rolle's case, the essential question concerns the appropriate sentence for Mr. Rolle under 18 U.S.C. § 3553. Probation has calculated the total offense level as 23, criminal history category VI, for a range of 92 to 115 months in prison.

The U.S. Sentencing Guidelines are no longer mandatory, but merely advisory. *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). And, the guidelines themselves are but one factor in a myriad of factors the Court must consider. "Sentencing is a difficult art [and it] is easy to make it mechanical. It is impossible to make it scientific in the sense of a hypothesis validated or invalidated by experiment. It is, however, an act of reason as the judge looking at this particular person and the circumstances of the crime that this particular person has committed makes a judgment following the prescriptions of the statute." *United States v. Diaz-Argueta,* 447 F.3d 1167 (9th Cir. 2006). In other words, "fashioning a just sentence cannot be reduced to a mere arithmetical exercise [and that] reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produces an illusory precision that obscures the fact that sentencing, in the end, must involve the exercise of *judgment.*" *United States v. Biheiri*, 356 F.Supp. 2d 589 (E.D.Va. 2005).

Furthermore, the guidelines carry no presumption of reasonableness and this Court is free to fashion a sentence outside the guidelines, after considering the factors in 18 U.S.C. § 3553(a). *Gall v. United States*, 128 S. Ct. 586 (2007); *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005). Sentencing under § 3553 (a) therefore requires the Court to start with the minimum sentence permissible and add only so much additional punishment, if any, as necessary to comply with § 3553(a)'s purposes. *See generally United States v. Abadessa*, 848 F.Supp. 369, 378 (E.D.N.Y. 1994) ("parsimony" is a "key provision" of § 3553(a)), *vacated on other grounds*, *United States v. DeRiggi,* 45 F.3d 713 (2d Cir. 1995); *see also generally* ABA STANDARDS OF CRIMINAL JUSTICE § 18-

2.4 (sentences "imposed, taking into account the gravity of the offense, should be no more than necessary to achieve the social purposes for which they are authorized"). A sentencing judge's authority to impose sentences substantially lower than those advised by the Sentencing Guidelines has been confirmed. *See Kimbrough v. United States,* 552 U.S. 85, (2007). A sentence that is below the recommended Guideline range does not need to be supported by extraordinary circumstances and the trial judge's sentencing findings should be given great weight. *Gall,* 552 U.S. at 45-48.

There are numerous departures and/or variances that should be granted in this case to reduce Mr. Rolle's sentence. If this Court applies a 1:1 crack to powder cocaine ratio and also agrees with Mr. Rolle regarding his objections to the overstatement of his criminal history, Mr. Rolle's advisory guideline range would become total offense level as 13, criminal history category IV, for a range of 24 to 30 months in prison. A review of these factors suggests that a sentence of 30 months or less is an appropriate sentence for Mr. Rolle.

**A.      Mr. Rolle's mental and emotional issues warrant a downward departure or a variance from the advisory guidelines.**

The Sentencing Commission expressly encourages district courts to consider whether the defendant suffered from "significantly reduced mental capacity" at the time of the offense when deciding whether to grant a downward departure. *United States v. Steele*, 178 F.3d 1230, 1240 (11th Cir. 1999) (citing USSG § 5K2.13); *see also United States v. Russell*, 917 F.2d 512, 516-17 (11th Cir.1990)(reading USSG §§ 5H1.3 and 5K2.13 together, and concluding that "ordinarily mental and emotional conditions are irrelevant to mitigate defendants' culpability, but that in extraordinary instances the conditions may be relevant--but then only if the defendant committed a non-violent crime"). Section 5K2.13 provides that "a sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental

capacity." *United States v. Smith*, 289 F.3d 696, 714 (11th Cir. 2002) (quoting USSG. § 5K2.13). The application note defines "significantly reduced mental capacity" to mean that the defendant "has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." USSG § 5K2.13, application n.1.  In *United States v. Cantu*, 12 F.3d 1506 (9th Cir. 1993), the court held that "reduced mental capacity" refers to a lack of full intellectual functioning.  *Id.* at 1512.  "It connotes an impairment of the intellect, a failure to be able quickly or fully to grasp ordinary concepts."  *Id.*

It is not necessary that the mental illness be severe.  The plain language of § 5K2.13 authorizes departure on a showing of "significantly reduced mental capacity" without qualification as to the nature or cause of the reduced capacity (except with respect to voluntary drug use). *United States v. Lewison*, 988 F.2d 1005 (9th Cir. 1993).  The term "significantly reduced mental capacity" concerns "the effect of the impairment on the defendant, not the characteristics or the seriousness of the impairment itself." *Cantu*, 12 F.3d at 1513.

The section also provides that, "[i]f a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." *Steele*, 178 F.3d at 1240 (citing USSG § 5K2.13); *see United States v. Miller*, 146 F.3d 1281, 1285 (11th Cir.1998).  Further, the "goal of the guideline is lenity toward defendants whose ability to make reasoned decisions is impaired." *United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir. 1993).  Additionally, reduced mental capacity need only be a contributing cause of the crime, not the sole cause.  *Id.*; *United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993)(affirming 4-level downward departure under § 5K2.13 even though some drug use and noting that drug use was both a "product and a factor of [defendant's] impaired mental condition"); *United States v. Lauzon*, 938

F.2d 326, 331 (1st Cir. 1991); *United States v. Glick*, 946 F.2d 335, 338 (4th Cir. 1991); *United States v. Herbert*, 902 F.Supp. 827(N.D. Ill.1995)(following *Lewinson* and granting departure to a defendant suffering from an active depression illness and mixed personality state, and who had limited coping capacity and poor judgment because expert said his behaviors and thought patterns were influenced by his impaired mental condition). This supports the goal of § 5K2.13 to ensure "lenity toward defendants whose ability to make reasoned decisions is impaired." *Cantu*, 12 F.3d at 1512 (holding that the district court has discretion to downward depart in case of post-traumatic stress disorder and that the court should re-sentence with the awareness that "the criminal justice system long has meted out lower sentences to persons who although not technically insane are not in full command of their actions."); *United States v. Chatman*, 986 F.2d 1446, 1454 (D.C. Cir. 1993)(determining that a court's inquiry into the defendant's mental condition and the application of § 5K2.13 must be undertaken with a "view to lenity. . . .").

Here, Mr. Rolle's limited cognitive ability and emotional issues justifies a downward departure and/or a variance as they contributed to his role in the offense. School officials gave Mr. Rolle both a psychological and emotional evaluation while in grade school. He was diagnosed in grade school with emotional problems and his functioning IQ was found to be 81 which placed him in the 10% percentile, the low average range of intellectual ability. Throughout school, his reading and math skills never progressed above a 4th-lower 5th grade level. Despite these low scores, he was not placed in ESE classes and given extra assistance academically. He was, however, placed in ESE classes for his emotionally handicapped diagnosis.

A lengthy prison sentence can only exacerbate his problems. In this case, according to the Government, Mr. Rolle was involved in the offense with his mother. Moreover, his alcohol and drug use, was both a product of his mental and emotional issues, as well as a factor in his ability to

reason.  Accordingly, a downward departure under USSG §§ 5H1.2, 5H1.3 and 5K2.13 and/or a variance from the guidelines under *Booker* is warranted.

In this case, Mr. Rolle's needs can be better managed outside of a prison setting. Furthermore, supervision in a non-prison setting is less costly to the taxpayer than prison and it enables Mr. Rolle to have better treatment.[5]

### B.    Mr. Rolle's criminal history is over stated

Probation scored Mr. Rolle as having fifteen criminal history points, placing him in criminal history category VI.  Many of these criminal history points came from juvenile convictions that should not be scored against Mr. Rolle for several reasons. First, it does not appear that Mr. Rolle was represented by counsel on the alleged arrests and convictions in paragraphs 37-41, 43-44, & 53. "If the accused is not represented by counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty. . . .  The judgment of conviction pronounced by a court without jurisdiction is void . . . ." *Johnson v. Zerbst*, 304 U.S. 458, 468, 58 S.Ct. 1019, 1024-25 (1938); *United States v. Owens*, 15 F.3d 995, 999 (11th Cir. 1994) (A conviction obtained without counsel and without a knowing and voluntary waiver is  presumptively void and invalid as a matter of law.)  Thus, a conviction obtained in violation of the right to counsel cannot be used to enhance a subsequent sentence.  *United States v. Tucker*, 404 U.S. 443, 449 (1972); *Burgett v. Texas*, 389 U.S. 109, 115-16 (1967).  "[T]he admission of a prior criminal conviction that is constitutionally infirm under the standards of *Gideon* [*v. Wainwright*, 372 U.S. 335 (1964)] is inherently prejudicial and to permit use of such a tainted prior conviction for sentence enhancement would undermine the

---

[5]  In fact, the annual cost of incarceration is $25,894.50, while the annual cost of supervision is $3,743.23.  PSR at ¶ 83.

principle of *Gideon*. *Burgett*, 389 U.S., at 115, 88 S.Ct., at 262. A defendant may challenge the enhancement of his federal sentence during his sentencing proceeding on the ground that he was denied counsel in the predicate conviction, even if the predicate conviction has not been invalidated on that ground. *Custis v. United States*, 511 U.S. 485, 493-96 (1994); *Nichols v. United States*, 511 U.S. 738, 743 n.9 (1994); *see United States v. Phillips*, 120 F.3d 227, 231 (11th Cir. 1997); *United States v. Farris*, 77 F.3d 391, 397 (11th Cir. 1996).

　　　　Furthermore, the PSR indicates that the circumstances of the convictions listed in many of the paragraphs are not available.  There is no conclusive proof that those offenses were perpetrated by Mr. Rolle.  Also, undersigned was not given a copy of Mr. Rolle's NCIC report.  Moreover, the arrest records or priors do not have any fingerprints attached to conclusively link Mr. Rolle to the conviction or the prior arrests.  After receiving the PSR, undersigned received copies of these priors from Probation, as well as independently contacted the Clerk of Court and the Department of Juvenile Justice to obtain any additional information contained in the court files for these cases. None of the records received by the undersigned contain fingerprints or reliable identifiers to conclusively show that the prior conviction or the arrests for several of these offenses belong to Mr. Rolle.  Indeed, many of the actual records have been destroyed.  As such, this conviction and these arrests should not be considered in formulating a sentence or used to enhance Mr. Rolle's sentence because the Government cannot meet its burden of proving that Mr. Rolle committed these offenses. *See generally Shepard v. United States*, 2005 WL 516494 at *9 (Mar. 7, 2005) (holding that enquiry under the ACCA to determine whether a plea of guilty to burglary defined by a nongeneric statute necessarily admitted elements of the generic offense is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial

record of this information). Moreover, these arrests and convictions should be stricken from the PSR. *See United States v. Ojeda*, Case No.: 6:05-Cr-18-Orl-19JGG (M.D. Fla. 2005) (Fawsett, C.J.) (striking offenses from PSR based upon these same objections with consent of government); *United States v. Leslie Cox,* Case No. 6:04-cr-116-Orl-28DAB (M.D. Fla. 2005) (Antoon, J.) (same); *United States v. Patrick Daniels*, Case No. 6:04-CR-112-ORL-18KRS (Sharp, J.) (same);*United States v. Julio Cesar Reyes*, Case No.: 6:05-CR-62-ORL-22DAB (Conway, J.) (same); *United States v. Christopher Worden*, Case No.: 6:04-CR-179-ORL-19JGG (Fawsett, C.J.) (same); *United States v. Harold King*, 6:05-cr-121-Orl-22KRS (Conway, J.) (same); *United States v. Edward Johanson*, 6:05-cr-186-ORL-28KRS (Antoon, J.) (same); *United States v. Ricky Glasco*, 6:05-cr-196-ORL-22DAB (Conway, J.) (same);*see also United States v. Burton*, Case No.: 6:04-CR-66-ORL-28JGG (M.D. Fla. 2005) (Antoon, J.) (striking offenses from PSR based upon these objections over government opposition)

As a result of these uncounseled arrests and convictions, and the lack of appropriate records, Mr. Rolle's criminal history over-states the seriousness of his prior criminal behavior. Mr. Rolle asks the Court to strike these items from the PSR and to not consider them in fashioning an appropriate sentence. If granted, this would reduce Mr. Rolle's criminal history points to 8, placing him in category IV.

### C. Notwithstanding the FSA, Mr. Rolle should be sentenced by this Court using a 1:1 crack to powder cocaine ratio

Even after the recent changes in the law, the sentencing guidelines do not provide a fair or reasonable sentencing structure for crack cocaine. The present guidelines, originally put in place over 15 years ago, intended to combat the perceived problems of higher addiction rates, greater violence associated with crack distribution, devastating effects on users' unborn children, and the

cheap and plentiful availability.  *See generally*, United States Sentencing Commission, 2002 SPECIAL REPORT TO CONGRESS.  These problems never developed as Congress had foresaw, and now seem less relevant for sentencing involving crack cocaine.  *See id.*  The passage of the FSA only reduced the disparity between powder and crack cocaine sentences--instead of 100 grams of crack cocaine being punished the same as 1 gram of powder cocaine, the new ratio will be 18 grams of crack equals 1 gram of powder cocaine.  It did not eliminate the disparity.  Courts in this district and across the country have previously applied a 1:1 crack to powder ratio to eliminate disparity in sentencing.  *See United State v. Mills*, 6:02-cr-00184-ACC-GJK (M.D. Fla. 2010).

Mr. Rolle submits that the only fair sentencing would be under a 1:1 ratio, notwithstanding the passage of the FSA.  It is fundamentally wrong for the courts and Congress to perpetuate this racially discriminatory disparity between crack and powder cocaine.  If Mr. Rolle were sentenced under a 1:1 ratio, his guidelines would become level 13, criminal history IV, for an advisory range of 24 to 30 months.

**D.    Pertinent policy statements of the Sentencing Commission**

Congress has recognized that in some cases "imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).  Additionally, 28 U.S.C. § 994(j) states:   "The [Sentencing] Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." Although this offense is a serious offense, the facts and circumstances of this case, as well as Mr. Rolle's history, and characteristics, mitigate in favor of a reduced sentencing.

Additionally, the Sentencing Commission has recently released several reports on recidivism rates for offenders.  *See generally* Measuring Recidivism: The Criminal History Computation of the

Federal Sentencing Guidelines [*hereinafter* Measuring Recidivism]; Recidivism and the "First Offender"; A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score. These reports support the conclusion that Mr. Rolle has a low likelihood of re-offending and that a prison sentence may actually increase the likelihood of recidivism—not reduce it.

For instance, the Commission concluded that recidivism rates were much lower for persons who received a non-prison sentence like probation or an alternative. *See* Measuring Recidivism at 13. Conversely, "offenders are most likely to recidivate (25.6%) when their sentence is a straight prison sentence." *See id.*

###### E.      The need to avoid unwanted sentencing disparities

A sentence of 30 months or less would not create an unwanted sentencing disparity between Mr. Rolle and other similarly-situated defendants. Rather, a sentence of 30 months or less will take into account the recently passed reduction in sentencing for crack cocaine offenses. The Fair Sentencing Act of 2010, did not eliminate, but only reduced the powder/crack disparity. Therefore, under these circumstances, Mr. Rolle should receive a sentence that is no more than any other similarly situated defendant involved with less than 20 grams of crack cocaine.

###### CONCLUSION

For the reasons stated herein, Mr. Rolle respectfully urges this Court to impose a sentence of 30 months or less in prison. Such a sentence will be reasonable and adequately take into account the advisory guideline range and the factors set forth at 18 U.S.C. § 3553(a). Such a sentence will be fair and just punishment.

I HEREBY CERTIFY that on February 1, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the

following: Jackson Boggs, Assistant United States Attorney.

Respectfully submitted,

/s/ Michelle P. Smith
Michelle P. Smith
Florida Bar No. 389382
Law Office of Michelle P. Smith, P.A.
827 Menendez Court
P.O. Box 1788
Orlando, Florida 32802-1788
Telephone:407-601-6700
Facsimile: 888-614-3231
Email: michellepsmith_law@yahoo.com