Department of Justice

**STATEMENT OF**

**LANNY A. BREUER
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE**

**BEFORE THE**

**UNITED STATES SENATE
COMMITTEE ON THE JUDICIARY
SUBCOMMITTEE ON CRIME AND DRUGS**

**HEARING ENTITLED**

**"RESTORING FAIRNESS TO FEDERAL SENTENCING:
ADDRESSING THE CRACK-POWDER DISPARITY"**

**PRESENTED**

**APRIL 29, 2009**

Mr. Chairman, Senator Graham, distinguished members of the Subcommittee — thank you for giving the Department of Justice the opportunity to appear before you today to share our views on the important issue of disparities in federal cocaine sentencing policy.

The Obama Administration firmly believes that our criminal and sentencing laws must be tough, predictable, fair, and not result in unwarranted racial and ethnic disparities. Criminal and sentencing laws must provide practical, effective tools for federal, state, and local law enforcement, prosecutors, and judges to hold criminals accountable and deter crime. The certainty of our sentencing structure is critical to disrupting and dismantling the threat posed by drug trafficking organizations and gangs that plague our nation's streets with dangerous illegal drugs and violence; it is vital in the fight against violent crime, child exploitation, and sex trafficking; and it is essential to effectively punishing financial fraud.

Ensuring fairness in the criminal justice system is also critically important. Public trust and confidence are essential elements of an effective criminal justice system — our laws and their enforcement must not only be fair, but they must also be perceived as fair. The perception of unfairness undermines governmental authority in the criminal justice process. It leads victims and witnesses of crime to think twice before cooperating with law enforcement, tempts jurors to ignore the law and facts when judging a criminal case, and draws the public into questioning the motives of governmental officials.

public trust and cooperation, coupled with the availability of legal tools that are both tough and fair. This Administration is committed to reviewing criminal justice issues to ensure that our law enforcement officers and prosecutors have the tools they need to combat crime and ensure public safety, while simultaneously working to root out any unwarranted and unintended disparities in the criminal justice process that may exist.

There is no better place to start our work than with a thorough examination of federal cocaine sentencing policy. Since the United States Sentencing Commission first reported 15 years ago on the differences in sentencing between crack and powder cocaine, a consensus has developed that the federal cocaine sentencing laws should be reassessed. Indeed, over the past 15 years, our understanding of crack and powder cocaine, their effects on the community, and the public safety imperatives surrounding all drug trafficking has evolved. That refined understanding, coupled with the need to ensure fundamental fairness in our sentencing laws, policy, and practice, necessitates a change. We think this change should be addressed in this Congress, and we look forward to working with you and other Members of Congress over the coming months to address the sentencing disparity between crack and powder cocaine.

In committing ourselves to pursuing federal cocaine sentencing policy reform, we do not suggest in any way that our prosecutors or law enforcement agents have acted improperly or imprudently during the last 15 years. To the contrary, they have applied

Most in the law enforcement community now recognize the need to reevaluate current federal cocaine sentencing policy – and the disparities the policy creates. Chief Timoney, Administrator Hutchison, and many other enforcement leaders have repeatedly and clearly indicated that the current federal cocaine sentencing policy not only creates the perception of unfairness, but also has the potential to misdirect federal enforcement resources. They have stressed that the most effective anti-drug enforcement strategy will deploy federal resources to disrupt and dismantle major drug trafficking organizations and drug organizations that use violence to terrorize neighborhoods.

For these and others reasons I will describe in the remainder of my testimony, we believe now is the time for us to re-examine federal cocaine sentencing policy – from the perspective of both fundamental fairness and public safety.

## Background

### A. *The Drug Trafficking Threat*

Cocaine and other illegal drugs pose a serious risk to the health and safety of Americans. The National Drug Intelligence Center's 2009 National Drug Threat Assessment identifies cocaine as the leading drug threat to society. Cocaine is a dangerous and addictive drug, and its use and abuse can be devastating to families regardless of economic background or social status. Statistics on abuse, emergency room

cocaine. We must never lose sight of these harms, their impact on our society, and our responsibility to reduce cocaine use and abuse.

Moreover, drug trafficking organizations and gangs have long posed an extremely serious public health and safety threat to the United States. The Administration is committed to rooting out these dangerous organizations. Whether it is Mexican or Colombian drug cartels moving large quantities of powder cocaine into and through the United States, or local gangs distributing thousands of individual rocks of crack in an American community, we will focus our resources on dismantling these enterprises – and disrupting the flow of money both here and abroad – to help protect the American public.

In the fight against illegal drugs, we also recognize that vigorous drug interdiction must be complemented with a heavy focus on drug prevention and treatment. Many state and federal inmates struggle with drug addiction, and not all get the treatment they need. The result is that many prisoners are unprepared to return to society. They not only re-offend, but they feed the lucrative black market for drugs. We cannot break this cycle of recidivism without increased attention to prevention and treatment, as well as comprehensive prisoner reentry programs.

It is only through a balanced approach – combining tough enforcement with robust prevention and treatment efforts – that we will be successful in stemming both the

B. *The Enactment of the Current Cocaine Sentencing Scheme*

In the 1980s, crack cocaine was the newest form of cocaine to hit American streets. As this Committee well knows, in 1986, in the midst of this exploding epidemic, Congress passed the Anti-Drug Abuse Act, which set the current federal penalty structure for crack and powder cocaine trafficking.[1]

In doing so, Congress established the five- and ten-year mandatory minimum sentencing regime still in effect today. Under the law, selling five grams of crack cocaine triggers the same five-year mandatory minimum sentence as selling 500 grams of powder cocaine; those who sell 50 grams of crack are sentenced to the same ten-year mandatory minimum as those selling 5,000 grams of powder cocaine. Pursuant to its mandate to ensure that the federal sentencing guidelines are consistent with all federal laws, the U.S. Sentencing Commission in 1987 applied this same "100-to-1" ratio to the sentencing guidelines.

Leading up to the enactment of this law, Congress was confronted with heightened public attention on the scourge of illegal drugs and high profile drug overdose deaths, including that of Len Bias, a National Collegiate Athletic Association basketball star drafted by the Boston Celtics. Proposals for making crack penalties more severe than

---

[1] In 1988, Congress also established a five gram, five-year mandatory minimum sentence for simple possession of crack cocaine, the only federal mandatory minimum penalty for a first offense of simple possession of a controlled substance. Anti-Drug Abuse Act of 1988, P.L., 100-690.

The legislative history does not provide definitive evidence for the rationale behind the adoption of the 100-to-1 ratio. What we do know from floor statements and reports on earlier versions of the enacted legislation is that during this debate, Congress sought to focus the tough five- and ten-year mandatory minimum penalties on "serious" and "major" traffickers—the traffickers who keep the street markets operating and the heads of drug trafficking organizations, responsible for delivering very large quantities of drugs. With stiff mandatory minimum penalties for crack cocaine set at levels as low as five grams, many have questioned whether these policy goals were achieved. An analysis by the Sentencing Commission using Fiscal Year 2005 data shows that 55 percent of federal crack defendants were street-level dealers. This compares with only 7.3 percent of powder defendants who were street-level dealers. And while both crack and powder offenders are concentrated in lower-level functions, crack cocaine offenders continue to be dominated by street-level dealers.

C. *The Science of Cocaine: One Drug, Two Forms*

Since the time Congress passed the crack cocaine penalties, much of the information on the different impact and effects of crack cocaine as compared to powder cocaine has come under scrutiny. We have since learned that powder cocaine and crack cocaine produce similar physiological and psychological effects once they reach the

According to the National Institute on Drug Abuse (NIDA), the key difference in cocaine's effects depends on how it is administered – by snorting, inhaling, or injecting. The intensity and duration of cocaine's effects – in any form – depend on the speed with which it is absorbed into the bloodstream and delivered to the brain. Smoking or injecting cocaine produces a quicker, stronger high than snorting it. For that reason, the user who is smoking or injecting the drug may need more of it sooner to stay high. Because powder cocaine is typically snorted, while crack is most often smoked, crack smokers can potentially become addicted faster than someone snorting powder cocaine. Notably, however, the NIDA has found that smoked cocaine is absorbed into the bloodstream as rapidly as injected cocaine, both of which have similar effects on the brain.

D. *The Policy Debate*

For nearly two decades, the 100-to-1 disparity has been the subject of dynamic debate and discussion among policymakers, academics, criminal justice organizations, and others.

The supporters of the current cocaine penalty structure believe that the disparity is justified because it accounts for the greater degree of violence and weapon possession or

addictive than powder, depending on the usual method of use.

This Administration shares these concerns about violence and guns used to commit drug offenses and other crimes associated with such offenses. We recognize that data suggests that weapons involvement and violence in the commission of cocaine-related offenses are generally higher in crack versus powder cases: a 2007 Sentencing Commission report found that weapons involvement for cocaine offenses was 27 percent for powder cocaine and 42.7 percent for crack. The same sample found that some form of violence occurred in 6.3 percent of powder cocaine crimes and in 10.4 percent of crack cocaine crimes.

Violence associated with any offense is a serious crime and must be punished; we think that the best way to address drug-related violence is to ensure the most severe sentences are meted out to those who commit violent offenses. However, increased penalties for this conduct should generally be imposed on a case-by-case basis, not on a class of offenders the majority of whom do not use any violence or possess a weapon. We support sentencing enhancements for those who use weapons in drug trafficking crimes, or those who use minors to commit their crimes, or those who injure or kill someone in relation to a drug trafficking offense. We also support charging separate weapons offenses to increase a sentence when an offender uses a weapon in relation to a drug trafficking offense.

disparity is difficult to justify based on the facts and science, including evidence that crack is not an inherently more addictive substance than powder cocaine. We know of no other controlled substance where the penalty structure differs so dramatically because of the drug's form.

Moreover, the Sentencing Commission has documented that the quantity-based cocaine sentencing scheme often punishes low-level crack offenders far more harshly than similarly situated powder cocaine offenders. Additionally, Sentencing Commission data confirms that in 2006, 82 percent of individuals convicted of federal crack cocaine offenses were African American, while just 9 percent were White. In the same year, federal powder cocaine offenders were 14 percent White, 27 percent African American, and 58 percent Hispanic. The impact of these laws has fueled the belief across the country that federal cocaine laws are unjust. We commend the Sentencing Commission for all of its work on this issue over the last 15 years. The Sentencing Commission reports are the definitive compilation of all of the data on federal cocaine sentencing policy. We cannot ignore their message.

### Moving Forward: A Tide of Change

Since 1995, at Congress's request, the Commission has called for legislation to substantially reduce or eliminate the crack/powder sentencing disparity. Most recently, in 2007, the Commission called the crack/powder disparity an "urgent and compelling" issue that Congress must address. Both chambers of Congress have held multiple

been introduced by members of both political parties.

In addition, the overwhelming majority of states do not distinguish between powder cocaine and crack cocaine offenses.

For the reasons outlined above, this Administration believes that the current federal cocaine sentencing structure fails to appropriately reflect the differences and similarities between crack and powder cocaine, the offenses involving each form of the drug, and the goal of sentencing serious and major traffickers to significant prison sentences. We believe the structure is especially problematic because a growing number of citizens view it as fundamentally unfair. The Administration believes Congress's goal should be to completely eliminate the sentencing disparity between crack cocaine and powder cocaine.

Earlier this month the Attorney General asked the Deputy Attorney General to form and chair a working group to examine federal sentencing and corrections policy. The group's comprehensive review will include possible recommendations to the President and Congress for new sentencing legislation affecting the structure of federal sentencing. In addition to studying issues related to prisoner reentry, Department policies on charging and sentencing, and other sentencing-related topics, the group will also focus on formulating a new federal cocaine sentencing policy; one that completely eliminates the sentencing disparity between crack and powder cocaine but also fully accounts for

– in individual cases – with both crack and powder cocaine trafficking. It will also develop recommendations for legislation, and we look forward to working closely with Congress and the Sentencing Commission on this important policy issue and finding a workable solution.

Until a comprehensive solution – one that embodies new quantity thresholds and perhaps new sentencing enhancements – can be developed and enacted as legislation by Congress and as amended guidelines by the Sentencing Commission, federal prosecutors will adhere to existing law. We are gratified that the Sentencing Commission has already taken a small step to ameliorate the 100:1 ratio contained in existing statutes by amending the guidelines for crack cocaine offenses. We will continue to ask federal courts to calculate the guidelines in crack cocaine cases, as required by Supreme Court decisions. However, we recognize that federal courts have the authority to sentence outside the guidelines in crack cases or even to create their own quantity ratio. Our prosecutors will inform courts that they should act within their discretion to fashion a sentence that is consistent with the objectives of 18 U.S.C. § 3553(a) and our prosecutors will bring the relevant case-specific facts to the courts' attention.

## Conclusion

As the history of this debate makes clear, there has been some disagreement about whether federal cocaine sentencing policy should change, and, if so, how it should change. This Administration and its components, including the Justice Department and

and members of Congress in both chambers to develop sentencing laws that are tough, smart, fair, and perceived as such by the American public. We have already begun our own internal review of sentencing and the federal cocaine laws. Our goal is to ensure that our sentencing system is tough and predictable, but at the same time promotes public trust and confidence in the fairness of our criminal justice system. Ultimately, we all share the goals of ensuring that the public is kept safe, reducing crime, and minimizing the wide-reaching, negative effects of illegal drugs.

Thank you for the opportunity to share the Administration's views, and I welcome any questions you may have.